IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 25-180 |
| ZAHFEER MANNING | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its undersigned attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Maureen McCartney, Assistant United States Attorney, respectfully files this sentencing memorandum regarding defendant Zahfeer Manning.

I. INTRODUCTION

Defendant Zahfeer Manning engaged in a years' long campaign to terrorize his ex-girlfriend, during which he relentlessly texted threats, vandalized her home, set fire to both her and her uncle's car, and firebombed her house while her family, including the defendant's son, were inside. Manning's unrelenting behavior made it clear that he had no regard for the law and that he was a real danger to the victim and her family.

On October 28, 2025, the defendant pled guilty to stalking, in violation of 18 U.S.C. § 2261A(2)(B) (Count One) and use of fire in the commission of a federal felony, in violation of 18 U.S.C. § 844(h)(1) (Count Two). During his plea colloquy, the defendant admitted to the facts below.

Manning committed serious crimes that warrant a serious penalty.  As explained below, the government recommends, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum, that the Court impose a sentence of 130 months' imprisonment, a 3-year period of supervised release, a $200 special assessment, and order restitution in the amount of $33,825.67.

I.      **FACTS OF THE CASE**

In April 2021, the victim, K.B., began a relationship with Manning.  At the time KB was living with family members (mother, two brothers, and an uncle) at 1850 N. 76th Street in Philadelphia. She eventually moved out and got her own place at 645 N. 66th Street in Philadelphia.  In October 2021, KB found out she was pregnant with her and Manning's son.  By November or December of that year, Manning became verbally abusive. KB gave birth to her son in June of 2022 and shortly after moved to 26 Park, Park 24, Upper Darby PA. At the end of July or beginning of August, KB broke up with Manning because his behavior had not improved.

For the sake of their son, KB allowed him to come and visit with the baby but was not interested in continuing the relationship.  Manning was not happy with the breakup and wanted to talk about getting back together.  This is when the threatening texts and phone calls began.

On October 21, 2022, KB called the Upper Darby Police to report that she had been getting threatening texts and calls over the past two days, threatening to beat her up and kill her. On October 22, 2022, Manning was arrested and a temporary protection from abuse order ("PFA") was served.

When Manning was released from jail the calls and text messages continued.  That PFA was vacated on November 2, 2022, when KB failed to appear.

The texts and calls continued unabated. Eventually, KB and her son moved back in with her family at 1850 N. 76th Street in Philadelphia.

On January 2, 2023, MANNING sent a series of texts from 215-488-4392, including *"This the wheel right next to y'all crib right"* (along with a picture of her uncle's car) and *"Getting ready for this ah big boom."* The texting and threats continued. On August 14, 2023, Fire Companies were dispatched to 1850 N. 76th Street for an auto fire at 3:10 a.m. A 2011 Dodge Nitro, PA tag# JGK-5916, VIN # 1D4PUGK3BW574631 was on fire. The owner of the car was KB's uncle and a resident of the house. The Fire Marshal found that the fire originated in the exterior front hood and bumper when an open flame was applied to ignitable liquid vapors. The fire spread to cause severe fire damage to the internal passenger compartment. The cause of fire was determined to be incendiary.

A nearby security camera showed an individual approaching the vehicle, pouring a liquid onto the hood and applying an open flame. The vapors ignited, causing a flash, followed by flames. The car was subsequently totaled.

The threatening texts and call continued.

On September 3, 2023, KB saw Manning across the street watching her. She called 911 and while she was waiting for police, Manning sent an email saying she was going to die. She later saw him walking by the house at midnight with a bottle in his hand. Police came but could not locate him. At around 4:00 a.m., police came to her house to say her car was on fire. (She was parking away from the house – at 7709 Overbrook Ave - out of fear of vandalism).

The Fire Marshal for the Philadelphia Fire Department responded to 7709 Overbrook Avenue for a car fire. The vehicle was a 2015 Buick Verano, PA tag# MFC7831, VIN #

1G4PR5SK9F4186554.  The fire originated on the exterior of the vehicle when an open flame was applied to available combustibles, and they ignited.  The fire caused severe thermal damage to the engine compartment of the vehicle.  The fire also extended to the rear of an adjacent vehicle (Black Acura TLX PA tag# LPY3762 VIN# 19UUB1F57KA003898) which caused severe damage to the exterior of the vehicle.  Security footage showed the defendant approach on a bicycle.  A flash was then seen in the same area before the defendant drove his bicycle away.  The cause of the fire was determined to be incendiary.

The texts and threats continued.  By this point KB and her family were keeping a constant vigil, not sleeping, and KB was continuing to make several reports to police.  The house was often vandalized, with rocks being thrown through the windows on several occasions. On March 15, 2024, as KB was being interviewed by police regarding an incident, Manning was actively texting her.

On March 12, 2024, KB reported to police that she had received messages from Manning that he was going to break the windows at her home.  A front window was thereafter broken.  A temporary PFA was issued.  On March 15, 2024, KB reported that she had been receiving numerous phone calls from 267-975-6181 and played a voicemail from that number and identified Manning's voice.  A warrant was issued for Manning's arrest for violating the PFA.

The texts and threats continued along with the vandalism at the house.  For instance, KB reported her window being broken with a rock April 19, 2024.  The next day, April 20, 2024, Manning texted, *"your stupid son gone die from choking in glass bitch hope ah piece of glass stab the lil dumb mf ina leg ina main artery while he crawling.*

On April 26, 2024, Manning was stopped by Delaware River Port Authority Police on an

unrelated matter and was arrested on the PFA violation warrant. Manning remained in custody until May 6, 2024, before being released. The text messages and phone calls from MANNING to K.B. resumed on May 7, 2024.

On May 16, 2024, the Philadelphia Fire Department was called to 1850 N. 76th Street at 1:57 a.m. The Fire Marshals found that the fire originated in the rear of 1850 N. 76th Street when an open flame was applied to the wick of a Molotov Cocktail and it was thrown against the rear of the property, near the rear door. The rear wall sustained moderate soot damage. The fire remained localized to the area of origin with no extension to the interior of the property.

Evidence was collected and sent for analysis. This evidence included a section of glass from an Everfresh juice bottle and a cloth wick, determined to be components of an improvised incendiary device. Ignitable liquid testing of the wick revealed the presence of gasoline

About 35 minutes after the firebombing, with law enforcement still on scene, K.B. began receiving messages from phone number 215-653-1857, which is a Pinger / TextFree Voice Over Internet Protocol (VoIP) account registered to "Zahfeer Manning" with email address zahfeerm764@gmail.com. The message read, *"Ik you ah rat lol law enforcement around but just know real ni\*\*as always come out on top lol tell em catch me if they can playa"*.

Over the course of the next several days, the stalking continued via threatening text messages from various phone numbers, including messages stating, *"Omm bro is I see you walk into that court building tomorrow ima beat you tf up"* (referring to a court date related to the Temporary PFA); *"I swear bitch if you don't come forward and tell me you wassup your whole family gone die yo" … "tell your folks burning the worse way to die bitch lol and I'm watch as y'all burn Ina fire to lol" … "tell your flks wake up and get ready call the fire department*

*playa"* … *"Let me tell you this lol one of my dad friends right doing 3 life sentences for killing his bm and the child and her mom by throwing ah fire bomb in they crib how many people in your crib 6 right os that mean I'ma do ah life sentence for every last one of y'all"* … *"Y'all bouta have to go to the red cross lol on 40th Lancaster"* and *"Great day to the light the fu\*\*ing neighborhood Up bitch I'm tired of playing these games with you (KB's first name) on (child's name) life"*. On May 20, 2024, Manning texted *"I'm kill your family tonight."*

Manning was finally arrested on a local warrant on May 30, 2024. At the time of his arrest seven (7) phones were recovered as well as proof of residency. Those phones were forensically evaluated and found to contain hundreds of threats.

K.B. identified phone number 267-254-1391, from which she had received threats the night of the house fire, as belonging to Manning.  Location data, including Cellular Site location and Historical Precision Location Information which provided longitude and latitude coordinates of the handset was obtained pursuant to a Pennsylvania search warrant. Analysis of the handset location data showed the phone close to K.B.'s home at the time of the firebombing.  The phone associated with this phone number was recovered at Manning's home at 6034 Spruce Street in Philadelphia following his arrest.

Analysis of K.B.'s phone and the phones recovered from Manning's residence revealed that the mobile phone applications TextFree, TextMe and TextNow had been used by Manning to communicate threats from varying phone numbers throughout the course of the harassing actions.  These applications allow the user to assign a telephone number within the application which may differ than the telephone number assigned to the handset by the cellular service provider.  Messages and calls made from within the application will appear to come from the

phone number generated in the application as opposed to the traditional phone number assigned to the handset. These applications also allow a user to communicate via text and phone call over wireless networks when the handset does not have cellular service activated. In total, more than 30 different phone numbers were used to communicate threats to K.B.

I.  **LEGAL STANDARD**

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors which the government suggests support the requested 130-month sentence.

## IV. SENTENCING CALCULATION

### A. **Statutory Maximum Sentence**.

The statutory maximum penalty for violating 18 U.S.C. § 2261(A)(2) is 10 years' imprisonment, three years of supervised release, a fine of $250,000, and a $100 special assessment.

The statutory maximum penalty for violating 18 U.S.C § 844 (h) is a mandatory minimum 10 years' imprisonment which must be consecutive to any other count, 3 years of supervised release, a fine of $250,000 and a $100 special assessment.

Thus, the total mandatory minimum and maximum sentence that may be imposed on the defendant is a term of imprisonment of 20 years imprisonment, a mandatory 10 years' imprisonment, a term of supervised release of three years, a fine of $500,000, and a special assessment of $200.

### B. **Sentencing Guidelines Calculation**.

The presentence report correctly calculates the defendant's effective guideline range of imprisonment as 150-157 months in light of the statutory mandatory minimum penalties in this case. PSR ¶ 132. The guideline range is determined by Count One (stalking) because Count Two (use of fire in furtherance of a federal felony) is excluded from the guideline calculation

because the offense requires a consecutive sentence mandated by statute, pursuant to USSG §§ 2K2.4, 3D1.1(b)(1), and 5G1.2(a).  PSR ¶ 57.

The base level for a violation of 18 U.S.C. § 2261A(2) is 18 pursuant to USSG § 2A6.2(a).  PSR ¶ 58. That level is increased by 4 levels pursuant to USSG 2 A6.2(b)(1), because the defendant persistently stalked, harassed, and threatened the victim and her family in violation of a court order of protection.  PSR ¶ 59. Pursuant to USSG §§ 3E1.1(a) and (b), the offense level is reduced by three levels because the defendant clearly demonstrated acceptance of responsibility and timely notified the government of his intention to plead guilty.  PSR ¶ 65, 66. Thus, the adjusted offense level is 19.  PSR ¶ 567. The defendant has one criminal history point which established a Criminal History Category of I.  PSR ¶ 75. Based on an offense level of 19 and a Criminal History category of I, the guideline range is 30-37 months imprisonment.  As stated earlier, there is a mandatory 120-month sentence of imprisonment which must be served consecutively to any other court.  Consequently, the total guideline range is 150-157 months.  PSR ¶ 57

## V.     GOVERNMENT'S RECOMMENDATION CONCERNING SENTENCING

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-

Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

  **A.**  **<u>Consideration of the 3553(a) Factors Regarding Imprisonment</u>.**

    **1. The Nature and Circumstances of the Offense**

The defendant committed extremely serious offenses. He engaged in an unrelenting campaign to torture the victim and as a result her family.  His threats became increasingly violent and, as the facts point out, he acted on them on several occasions.  Nothing deterred him from his course of conduct, not the victim begging him to stop, not putting his own child at risk, not being shot, and not being arrested.  The actions of the defendant have had real and continuing consequences for the victim and her family members.  The victim described the trauma that she endured and discussed how the defendant's actions caused immense mental, emotional, physical, and financial harm.  She also described how knowing that the defendant is in custody and the

threats have stopped has brought her and her family an immense sense of relief.[2] PSR ¶ 46. It is clear that the defendant's actions will continue to affect the victim's sense of security and safety. The requested sentence of 130 months imprisonment allows the victim and her family time to continue to rebuild their lives.

### 2. The History and Characteristics of the Defendant

The defendant's history supports the need for significant incarceration. The defendant's background paints a troubling picture. He reported an unstable and difficult childhood where he was in and out of juvenile detention, dependency placement, and psychiatric hospitals. He reported feeling abandoned by his mother and never knowing his father. His mother reported that he showed signs of mental illness and began acting out aggressively as early as three years old. According to his mother, he was diagnosed with attention deficit hyperactive disorder (ADHD) and oppositional defiance disorder (ODD) at age four or five. Based upon his mother's interview, it appears she became overwhelmed as a single mother raising a child with mental health issues. As a result, she had the defendant put in placement thinking it would help; however, she acknowledged, it did not help, it just got worse. She described that various medications were attempted but again, no improvement was noted. Records show that the defendant spent 994 days in placement as a juvenile, with both delinquent and dependent placements. The defendant reported that during most of these placements he was both sexually and physically abused.

The defendant does not appear to have had any consistent mental health treatment. Whatever treatment and medications he received while in placement would not be continued

---

[2] The victim was consulted regarding the C-Plea offer in this case and expressed support for it. She expressed gratitude in not having to be revictimized by enduring a trial.

once released. The defendant reported attempting suicide on multiple occasions, including twice when he was younger than a teenager. His mother indicated that those attempts occurred when the defendant was between 10 and 12. Since being incarcerated at the FDC, as a Care Level 2 inmate, the defendant has routine outpatient mental health care.

The defendant reported that he has three children. His oldest child, age six, is autistic. The child and his mother moved to California because they were looking for a better life. The child's mother stated that defendant does not have a relationship with his son because of the defendant's "mental illness and inconsistencies." It is unclear what, if any, relationship he has with his three-year-old son, and he does not have any relationship with his son by the victim in this case. Despite the initial efforts of the victim to allow the defendant continued access to their son, his behavior led to a total estrangement. He has had no contact with his children since he became incarcerated.

In addition to his untreated mental health issues, the defendant also developed a dependency on both controlled substances and alcohol. He reported a history of marijuana, ecstasy, Percocet, Xanax, and suboxone abuse, indicating that prior to his arrest he abused ecstasy, suboxone and marijuana daily. Although he denied ever overdosing, the BOP reported that he likely overdosed while in custody on August 5, 2025, when he was found unconscious in his cell. It is clear that whatever sentence the defendant receives should include mental health and drug treatment.

The government respectfully suggests that the defendant's well documented, long standing untreated mental health issues, along with his drug dependency issues, provide a basis for a downward variance.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and provide Just Punishment

There is a strong need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. Manning's obsessive criminal behavior resulted in devastating consequences for the victim and her family. Additionally, he continues to show a lack of respect for the law, through his disciplinary infractions and drug use while in federal custody.

### 4. The Need for Adequate Deterrence and Protection of the Public

Furthermore, the recommended sentence of incarceration affords adequate deterrence to others who commit a similar offense and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated.

### 5. The need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment

As discussed above, the defendant is in need of mental health and drug treatment. Whatever sentence is imposed should include a requirement that he participate in treatment while in custody as well as when he is released.

### 6. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

The government's recommended sentence is consistent with the statutory mandatory minimum sentence as well as careful consideration of the 3553(a) factors relevant to the defendant.

### 7. The Need to Provide Restitution to any Victims of the Offense

The government requests that the court order restitution in the amount of $33,825.67 payable to the following: Traveler's Insurance in the amount of $9,166.00; Progressive Insurance

in the amount of $9,045.45; Root Insurance Company in the amount of $15,184.92; and the victim K.B. in the amount of $429.30.

### B. Supervised Release.

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least 3 years is warranted. As explained above, the defendant's criminal conduct was gravely serious and has had long term consequences for the victim and her family. He also has suffered mental health issues and drug and alcohol issues which have never been adequately addressed. Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of

supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7). Further, the Sentencing Commission recognizes that "the more serious the defendant's criminal history, the greater the need for supervised release." § 5D1.1 app. note 2. The Commission adds: "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV.   CONCLUSION

The government recognizes that it's final recommendation of a sentence of 130 months' imprisonment, a 3-year period of supervised release, a $200 special assessment, and order restitution in the amount of $33,825.67 represents a variance from the guidelines but believes that looking at the 3553 factors as well as the wishes of the victim supports the variance.

    Respectfully submitted,

    DAVID METCALF
    United States Attorney


    */s Maureen McCartney*
    MAUREEN MCCARTNEY
    Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Jonathon McDonald, Esq.
601 Walnut Street, Suite 540 West
Philadelphia, PA 19106
Jonathan_Mcdonald@fd.org


*/s Maureen McCartney*
MAUREEN MCCARTNEY
Assistant United States Attorney

DATED:  March 3, 2026.